# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | | |
|---|---|---|
| ASCENTIUM CAPITAL LLC, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **CIVIL ACTION FILE** |
| | ) | **NO. _____** |
| MARSHALL LEBARRON GREEN, | ) | |
| a/k/a Matthew Clower, a/k/a PETER | ) | |
| CARROLL, a/k/a MICHAEL P. | ) | |
| CARROLL, Individually and d/b/a | ) | |
| CARROLL MANAGEMENT | ) | |
| GROUP, LLC, TEMARQUE | ) | |
| BROWN, ALIYA RAY, and | ) | |
| JOHN DOES 1-100, | ) | |
| | ) | |
| **Defendants.** | ) | |

## COMPLAINT

COMES NOW Plaintiff Ascentium Capital LLC ("Ascentium"), and states its Complaint against the above-named Defendants as follows:

### PRELIMINARY STATEMENT

Ascentium is the victim of two fraudulent equipment finance transactions orchestrated by Defendant Marshall LeBarron Green ("Green") with the active participation of Defendants TeMarque Brown ("Brown") and Aliya Ray ("Ray"). Green presented himself to Ascentium under the aliases "Peter Carroll" and "Michael Peter Carroll" of Carroll Management Group ("CMG") in Atlanta. There is a legitimate company, Carroll Management Group, LLC, d/b/a CARROLL,

located at 3340 Peachtree Road in Atlanta, Georgia ("CARROLL").   However, Ascentium discovered after-the-fact that Green and CMG are not associated with CARROLL.   Indeed, CMG is not a real company.

Last year Ascentium approved and provided in excess of $300,000 of loans to Green's fictitious company, CMG, to purchase computer equipment.   Green used phony names, bank statements, and financial records to induce Ascentium to approve the transactions, then arranged to take delivery of the equipment from the vendor at temporary office space, then absconded with the equipment, and ultimately left Ascentium with a total loss on the transactions.

Ascentium has learned Green is not associated with CARROLL, CMG is not a bona fide company, the tax returns, statements, and records are doctored, and Green used multiple aliases and co-conspirators to achieve his fraudulent ends.

In support hereof, Ascentium alleges the following:

## PARTIES, JURISDICTION, AND VENUE

1.     Ascentium is a limited liability company with a primary place of business in Texas.

2.     Ascentium is wholly owned by RF Ascentium, LLC, and RF Ascentium, LLC in turn is wholly owned by Regions Bank.

3.     Regions Bank is an Alabama corporation with its principal place of business in Birmingham, Alabama.

4.     Green is a resident of the state of Georgia and may be served with a summons and complaint by service at his residence of 1709 Archer Estates Drive NW, Kennesaw, Georgia 30152 or wherever he may be found.

5.     Brown is a resident of the state of North Carolina and may be served with a summons and complaint by service at her residence of 5622 Lilac Tree Avenue, Charlotte, North Carolina 28227 or wherever she may be found.

6.     Ray is a resident of the state of South Carolina and may be served with a summons and complaint by service at her residence of 304 Huntingdale Place, Simpsonville, South Carolina 29681 or wherever she may be found.

7.     Defendants John Does 1-100 ("Does") are parties who may be subject to liability for claims or debts arising out of or relating to fraudulent conduct and the Equipment Finance Agreements (as defined below) that are the subject matter of this action.

8.     This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332 as the parties are of diverse citizenship and the amount in controversy exceeds $75,000.00.

9.     As to Ascentium's claims arising under the Federal Racketeer Influenced & Corrupt Organizations Act, 18 U.S.C. §§ 1961–1968 (the "RICO Act"), this Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1331.

10.     As to Ascentium's claims arising under state law, this Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1367, as the state law claims are so related to Ascentium's federal RICO Act claims that they form part of the same case or controversy.

11.     This Court has personal jurisdiction over Green in that he is a resident of the State of Georgia and he continuously and systematically conducted business in Georgia.

12.     This Court has personal jurisdiction over Brown, Ray, and Does for one or more of the following reasons:

        a.     The exercise of personal jurisdiction over Brown, Ray, and Does by this Court is consistent with the Federal Due Process Clause as Brown, Ray, and Does have established minimum contacts with this forum such that the exercise of jurisdiction over Brown, Ray, and Does would not offend traditional notions of fair play and substantial justice;

        b.     Brown, Ray, and Does have done business in the State of Georgia and with one or more residents of the State of Georgia; and

        c.     Brown, Ray, and Does have committed tortious injury to Ascentium and to Ascentium's business operations within this District.

13.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2), because a substantial part of the wrongful conduct occurred in this district.

## ASCENTIUM'S BUSINESS MODEL

14.     Ascentium is a commercial lender that provides equipment and technology financing solutions for companies ranging in size to family-owned businesses to Fortune 500s.

15.     Among other industries, Ascentium provides financing and leasing options for manufacturers, distributors, resellers, and franchise organizations, as well as direct financing options for small businesses in the United States.

16.     With the typical equipment finance transaction, Ascentium provides funding for some or all of the purchase price of the equipment on credit terms, and Ascentium takes a purchase money security interest in the equipment to secure repayment.

17.     In these equipment finance transactions, Ascentium's collateral is often a significant if not primary source of recovery if the customer defaults on the loan. Accordingly, the availability and value of the collateral is often a critical aspect of Ascentium's lending decisions.

## THE FIRST FRAUDULENT TRANSACTION

### A.     The Initial Computer Quote and Fraudulent Misrepresentations to Ascentium

18.     On or about May 14, 2019, Green contacted a vendor, IT Gurus of Atlanta ("IT Gurus"), to purchase computers and various Microsoft products for a

business he identified as CMG.  During his discussions with IT Gurus, Green used the alias Peter Carroll.

19.    On or about May 15, 2019, Green obtained a quote from IT Gurus of Atlanta for sixty-four (64) Microsoft Surface Pro 12.3" Core i7865OU 16 GB 512 GB SSD computers, sixty-four (64) keyboards, and sixty-four (64) extended service plans at a price of $146,631.12 (the "May 15 Quote").  A true and correct copy of the May 15 Quote is attached hereto as **Exhibit A** and incorporated herein.

20.    The customer listed in the May 15 Quote is identified as: Peter Carroll, Carroll Management Group, 3340 Peachtree Road NE, Atlanta, GA 30326, and identified the following telephone number and email address: (404) 877-8092 and pcarroll@carrollmanagementgrp.com.

21.    Green represented to IT Gurus that he was purchasing the items in the May 15 Quote for CMG's business use.

22.    Green requested available options to finance the purchase from IT Gurus, and IT Gurus directed Green to Ascentium.

23.    Green, holding himself out as "Michael P. Carroll", submitted a credit application to Ascentium (the "CMG Credit Application"), wherein he requested financing to purchase the items in the May 15 Quote from IT Gurus.  A true and correct copy of the CMG Credit Application is attached hereto as **Exhibit B** and incorporated herein.

24.    At all times pertinent hereto, beginning with submission of the CMG Credit Application, Green held himself out as the owner and authorized representative of CMG.

25.    In furtherance of the CMG Credit Application, Green provided Ascentium with falsified audited financial statements (the "CMG Financial Statements") and a falsified BB&T bank statement (the "CMG Bank Statement") reflecting legitimate business activities and net worth.  True and correct copies of the CMG Financial Statements and CMG Bank Statement are collectively attached hereto as **Exhibit C** and incorporated herein.

**B.    IT Gurus Invoice #11121**

26.    After Green submitted the CMG Credit Application to Ascentium, Green asked IT Gurus change the list of items for purchase.  As a result, IT Gurus issued Invoice # 11121 on May 20, 2019 with an updated list of equipment to sell to Green's company CMG.

27.    Invoice #11121 lists the same customer name, address, and telephone number as the May 15 Quote.  Invoice #11121 lists thirty-six (36) Microsoft Surface Pro 12.3" Core i7865OU 16 GB 1TB SSD computers, twenty-eight (28) Microsoft Surface Pro 12.3" Core i7865OU 16 GB 512 GB SSD computers, and sixty-four (64) extended service plans for a total purchase price of $152,848.00 (all such hardware

collectively referred to as the "First Computers").  A true and correct copy of Invoice #11121 is attached hereto as **Exhibit D** and incorporated herein.

28.    Green transmitted Invoice #11121 to Ascentium and requested an update to the First Credit Application in order to obtain the necessary financing.

**C.    The First EFA between Ascentium and CMG**

29.    In reliance on the CMG Credit Application, the CMG Financial Statements, and the CMG Bank Statement, Ascentium approved the funding requested for Invoice #11121.

30.    On or about May 17, 2019, Ascentium sent Green (i) a notice of its approval of the Credit Application, and (ii) Equipment Finance Agreement, Agreement No. 2374557 (collectively, the "First EFA") documenting the terms in which Ascentium would finance CMG's purchase of the First Computers.  A true and correct copy of the First EFA is attached hereto as **Exhibit E** and incorporated herein.

31.    On or about May 20, 2019, Green electronically executed the First EFA as Michael Carroll of CMG, using IP Address 24.98.157.238.  See Ex. E, p. 3.

32.    On or about May 21, 2019, Green submitted a falsified Certificate of Signature in connection with the First EFA, whereby Green certified under oath that his name is Michael P. Carroll and, on information and belief, inserted a notary stamp/signature from another document to give the appearance a notary witnessed

his execution of the Certificate of Signature.   A true and correct copy of this Certificate of Signature is attached hereto as **Exhibit F** and incorporated herein.

33.     On or about May 21, 2019, Green also executed an Addendum to the First EFA on behalf of CMG.  A true and correct copy of this Addendum is attached hereto as **Exhibit G** and incorporated herein (the First EFA, the related Certificate of Signature, and the related Addendum are collectively referred to as the "First Financing Documents").

**D.     Funding of IT Gurus Invoice #11121**

34.     On May 21, 2019, Ascentium transferred $152,848.00 to IT Gurus to pay Invoice #11121 on CMG's behalf.  A true and correct copy of the funding receipt and funding instructions are collectively attached hereto as **Exhibit H** and incorporated herein.

35.     On May 22, 2019, Ascentium emailed Green a "Welcome Letter" confirming related to the First EFA (the "First Welcome Letter").  A true copy of the First Welcome Letter is attached hereto as **Exhibit I** and incorporated herein.

**E.     Shipment of the First Computers to CMG**

36.     The First Computers were shipped on May 23, 2019 as part of six (6) UPS packages to the office building where CARROLL is located at 3340 Peachtree Road NE, Atlanta, Georgia 30326.

37.    On information and belief, Green took possession of the First Computers on or shortly after May 23, 2019.

38.    On May 28, 2019, Ascentium recorded a Uniform Commercial Code Financing Statement (or "UCC-1") in Barrow County, Georgia, wherein Ascentium perfected its first priority security interest in the First Computers.  A true and correct copy of this UCC-1 is attached hereto as **Exhibit J** and incorporated herein.

39.    On information and belief, Green re-sold some or all of the First Computers or otherwise used them to generate cash.

## THE SECOND FRAUDULENT TRANSACTION

### A.    IT Gurus Invoice #11127

40.    On or about May 24, 2019, Green contacted IT Gurus to make a second purchase for CMG.

41.    IT Gurus issued Invoice # 11127 to Green using his alias "Peter Carroll" of CMG for fifty-three (53) Apple MacBook Pro computers (the "Second Computers") at a total purchase price of $160,617.30.  A true and correct copy of Invoice #11127 is attached hereto as **Exhibit K** and incorporated herein.

42.    On or about May 24, 2019, IT Gurus submitted Invoice #11127 to Ascentium on Green's behalf for the purpose of applying for funding again.

43.    In reliance on the CMG Credit Application, the CMG Financial Statements previously provided by Green, and the CMG Bank Statement previously

provided by Green, Ascentium approved the funding for CMG to purchase the Second Computers.

**B.     The Second EFA between Ascentium and CMG**

44.     On or about May 31, 2019, Ascentium sent Green (i) notice of its approval Invoice #11127 for funding, and (ii) Equipment Finance Agreement, Agreement No. 2376391 (collectively, the "Second EFA") documenting the terms in which Ascentium would provide the funding.  A true and correct copy of the Second EFA is attached hereto as **Exhibit L** and incorporated herein.

45.     On or about May 31, 2019, Green executed the Second EFA as Michael Carroll on behalf of CMG.  See Ex. L at p. 2.

46.     On or about May 31, 2019, Green executed and delivered (i) a Commencement Agreement, and (ii) a falsified Certificate of Signature in connection with the Second EFA, whereby Green certified under oath that his name is Michael P. Carroll and, on information and belief, inserted a notary stamp/signature from another document to give the appearance a notary witnessed his execution of the Certificate of Signature.  True and correct copies of this Commencement Agreement and Certificate of Signature are collectively attached hereto as **Exhibit M** and incorporated herein (the Second EFA, the related Commencement Agreement, and the related Certificate of Signature are collectively referred to as the "Second Financing Documents").

C.    **Funding of IT Gurus Invoice #11127**

47.    On May 31, 2019, Ascentium paid IT Gurus the sum of $168,737.49 on CMG's behalf for Invoice #11127.  A true and correct copy of the funding receipt and funding instructions are collectively attached hereto as **Exhibit N** and incorporated herein.

48.    On May 31, 2019, Ascentium emailed Green a "Welcome Letter" related to the Second EFA (the "Second Welcome Letter").  A true and correct copy of the Second Welcome Letter is attached hereto as **Exhibit O** and incorporated herein.

49.    Before the shipment of the Second Computers, Green — using the alias Matthew Clower — contacted a local office-share firm, Industrious ATL 3424 Peachtree Road LLC ("Industrious"), requesting information about renting office space for CMG in the Monarch Tower office building located at 3424 Peachtree Road NE, Suite 2200, Atlanta, Georgia 30326 (the "Monarch Tower Office Space").

50.    During his tour of the Monarch Tower Office Space and during all of his communications with Industrious, Green continued to falsely hold himself out as Matthew Clower, an authorized representative of CMG.

51.    On June 4, 2020, Green executed a Membership Agreement with Industrious as Matthew Clower for CMG (the "CMG Office Lease"), whereby CMG

rented three (3) office seats at the Monarch Tower Office Space. A true and correct copy of the CMG Office Lease is attached hereto as **Exhibit P.**

52.     Industrious' business records identify that Matthew Clower identified himself as the main point of contact for CMG at phone number: (404) 877-8092 and email address: mclower@carrollmanagementgrp.com.

53.     Green also provided Industrious with (a) Peter Carroll, (b) Defendant Brown, and (c) Defendant Ray as additional CMG representatives.

54.     In addition to communicating with Green, Industrious also communicated with Brown and Ray about the Monarch Tower Office Space and CMG Office Lease.

**D.     Shipment of Second Computers to CMG**

55.     Mere minutes before executing the CMG Office Lease with Industrious, Green emailed IT Gurus to request a delivery change for the Second Computers.  Green directed IT Gurus to ship the Second Computers to the Monarch Tower Office Space instead.   A true and correct copy of this correspondence from Green is attached hereto as **Exhibit Q**.

56.     In response to Green's directions, IT Gurus caused the shipper to send the Second Computers to the Monarch Tower Office Space.  Thirty-nine (39) MacBook Pro computers were shipped to the Monarch Tower Office Space on June 8, 2019 and, on information and belief, Green took delivery on June 10, 2019.

57.     On June 10, 2019, Ascentium recorded a UCC-1 in Barrow County, Georgia, perfecting its first priority security interest in the Second Computers.  A true and correct copy of this UCC-1 is attached hereto as **Exhibit R** and incorporated herein.

58.     The remaining fourteen (14) MacBook Pro computers purchased as part of the Second EFA were shipped on June 13, 2019 and, on information and belief, Green took delivery between June 14, 2019 and June 17, 2019.

59.     On information and belief, Green re-sold some or all of the Second Computers or otherwise used them to generate cash.

## CMG'S FAILURE TO PAY

60.     On or about June 20, 2019, Ascentium initiated a draw in the amount of $3,135.91 for the first installment payment due under for the First EFA.

61.     The ACH withdrawal was declined due to inaccuracies in the CMG deposit account details provided by Green.

62.     On or about June 20, 2019, Ascentium initiated a second attempt at a draw in the amount of $3,135.91 for the first installment payment due under the First EFA.

63.     Once again, the ACH withdrawal was declined due to inaccuracies in the CMG deposit account details provided by Green.

64.     On or about July 1, 2019, Ascentium initiated a draw in the amount of $5,112.10 for the first installment payment due under the Second EFA.

65.     For a third time, the ACH withdrawal was declined due to inaccuracies in the CMG deposit account details provided by Green.

66.     On or about July 10, 2019, Ascentium called the phone number on file for CMG.   The Ascentium representative requested updated bank account information to process the initial payments due Ascentium under the First EFA and the Second EFA.   Green advised the Ascentium representative that he would call Ascentium back with correct bank information.

67.     Green never contacted Ascentium again.   Green disappeared.

68.     As of the date of this Complaint, Ascentium has not been paid any sum under the First EFA or the Second EFA (collectively, the "EFAs"), nor has Ascentium been able to locate the First Computers or Second Computers (collectively, the "Collateral").

## COUNT I

### FRAUD

### (As to Defendant Marshall LeBarron Green)

69.     Ascentium incorporates the allegations in the preceding paragraphs of this Complaint as if restated herein.

70.     Green, acting independently and as part of a civil conspiracy with his co-defendants, obtained the Collateral through a fraudulent scheme to induce Ascentium to fund his transactions with IT Gurus.

71.     Among other things, Green made the following false and misleading statements to Ascentium in connection with the EFAs (all of which are collectively referred to as the "Fraudulent Misrepresentations"):

a.      Green lied about his name, identifying himself under the aliases Peter Carroll and Michael Peter Carroll;

b.      Green represented CMG as the bona fide business CARROLL, even though there is no affiliation between Green and CARROLL;

c.      Green represented CMG as a legal entity, even though it is not and does not appear to have ever been a valid legal entity existing under the laws of Georgia or any other state;

d.      Green represented that CMG operated out of the office space where CARROLL is located in Atlanta, Georgia;

e.      Green represented that CMG was purchasing the Collateral for its business operations;

f.      Green represented that the CMG Credit Application contained accurate information;

g.     Green represented that the CMG Financial Statements were bona fide financial records of CMG; and

h.     Green represented that the CMG Bank Statement was a bona fide financial record of CMG.

72.     Green, acting independently and as part of a civil conspiracy, knew his Fraudulent Misrepresentations are false and were false when made.

73.    Green knowingly and intentionally made the Fraudulent Misrepresentations to induce Ascentium to approve the CMG Credit Application and fund his purchases of the Collateral from IT Gurus.

74.    Ascentium justifiably and reasonably relied upon these Fraudulent Misrepresentations to its detriment.

75.    If Ascentium had been aware the Fraudulent Misrepresentations are individually and collectively false, Ascentium would have rejected the CMG Credit Application.

76.    If Ascentium had been aware the Fraudulent Misrepresentations are individually and collectively false, Ascentium would have withheld the funding for Green's purchase of the First Computers.

77.    If Ascentium had been aware the Fraudulent Misrepresentations are individually and collectively false, Ascentium would have withheld the funding for Green's purchase of the Second Computers.

78.     Ascentium suffered significant harm and incurred substantial damages as a direct and proximate result of its reasonable and justifiable reliance on the Fraudulent Misrepresentations by Green.

79.     Green has committed the tort of fraud against Ascentium, and Ascentium is claiming damages caused by such fraud in an amount to be proven at trial.

## COUNT II

### FRAUD

**(As to Defendant TeMarque Brown)**

80.     Ascentium incorporates the allegations in paragraphs 1 through 79 of this Complaint as if restated herein.

81.     Green held out Defendant Brown as another representative of CMG while setting up the CMG Office Lease with Industrious.

82.     Industrious sent email communications to Brown related to the CMG Office Lease.

83.     On information and belief, Brown knew of and actively participated in Green's scheme to enter into the CMG Office Lease for the purpose of engaging in illicit activities, including specifically creating a place to take delivery of the Second Computers before absconding with them.

84.    On information and belief, Brown knew that Green was defrauding Ascentium, he was using Industrious to perpetrate the fraud, he had no intention of making payments to Industrious or otherwise performing under the CMG Office Lease, he had no intention of making payments to Ascentium or otherwise performing under the EFAs, and he was holding out CMG as a legitimate company even though it is neither incorporated nor engaged in any bona fide business activities.

85.    On information and belief, Brown received copies of the First Financing Documents and the Second Financing Documents, each of which includes a provision that the information from Green is "true, accurate, complete, and not misleading."

86.    On information and belief, Brown also received a copy of the CMG Office Lease, which expressly prohibits use of the Monarch Tower Office Space for illegal activities.

87.    On information and belief, Brown knew she had an obligation to disclose the illegal and fraudulent scheme to Ascentium and Industrious.

88.    If Brown had disclosed to Ascentium that the First Financing Documents contains false and misleading information—e.g., for example, that Green was using a fictitious name and fictitious company to acquire funding to

purchase the Collateral—Ascentium would not have funded the purchase of the First Computers.

89.   If Brown had disclosed to Ascentium that the Second Financing Documents contains false and misleading information—e.g., for example, that Green was using a fictitious name and fictitious company to acquire funding to purchase the Collateral—Ascentium would not have funded the purchase of the Second Computers.

90.   If Brown had disclosed to Industrious that Green was utilizing the Monarch Tower Office Space for a fraudulent purpose, Green would have been deprived of the opportunity to use the Monarch Tower Office Space as a place of delivery of the Second Computers.

91.   Ascentium suffered significant harm and incurred substantial damages as a direct and proximate result of Brown's failure to disclose material facts to which she was privy and which demonstrated Green was perpetrating a fraud upon Ascentium.

92.   Brown has committed the tort of fraud against Ascentium, and Ascentium is claiming damages caused by such fraud in an amount to be proven at trial.

## COUNT III

### FRAUD

### (As to Defendant Aliya Ray)

93.     Ascentium incorporates the allegations in paragraphs 1 through 79 of this Complaint as if restated herein.

94.     Green held out Defendant Ray as another representative of CMG while setting up the CMG Office Lease with Industrious.

95.     Industrious sent email communications to Ray related to the CMG Office Lease.

96.     On information and belief, Ray knew of and actively participated in Green's scheme to enter into the CMG Office Lease for the purpose of engaging in illicit activities, including specifically creating a place to take delivery of the Second Computers before absconding with them.

97.     On information and belief, Ray knew that Green was defrauding Ascentium, he was using Industrious to perpetrate the fraud, he had no intention of making payments to Industrious or otherwise performing under the CMG Office Lease, he had no intention of making payments to Ascentium or otherwise performing under the EFAs, and he was holding out CMG as a legitimate company even though it is neither incorporated nor engaged in any bona fide business activities.

98.    On information and belief, Ray received copies of the First Financing Documents and the Second Financing Documents, each of which includes provision that the information from Green is "true, accurate, complete, and not misleading."

99.    On information and belief, Ray also received a copy of the CMG Office Lease, which expressly prohibits use of the Monarch Tower Office Space for illegal activities.

100.   On information and belief, Ray knew she had an obligation to disclose the illegal and fraudulent scheme to Ascentium and Industrious.

101.   If Ray had disclosed to Ascentium that the First Financing Documents contains false and misleading information—e.g., for example, that Green was using a fictitious name and fictitious company to acquire funding to purchase the Collateral—Ascentium would not have funded the purchase of the First Computers.

102.   If Ray had disclosed to Ascentium that the Second Financing Documents contains false and misleading information—e.g., for example, that Green was using a fictitious name and fictitious company to acquire funding to purchase the Collateral—Ascentium would not have funded the purchase of the Second Computers.

103.   If Ray had disclosed to Industrious that Green was utilizing the Monarch Tower Office Space for a fraudulent purpose, Green would have been

deprived of the opportunity to use the Monarch Tower Office Space as a place of delivery of the Second Computers.

104.   Ascentium suffered significant harm and incurred substantial damages as a direct and proximate result of Ray's failure to disclose material facts to which she was privy and which demonstrated Green was perpetrating a fraud upon Ascentium.

105.   Ray has committed the tort of fraud against Ascentium, and Ascentium is claiming damages caused by such fraud in an amount to be proven at trial.

## COUNT IV

### MISLEADING TRANSMITTAL AND USE OF INDIVIDUAL'S NAME OVER COMPUTER

### (As to Defendant Marshall Lebarron Green)

106.   Ascentium incorporates the allegations in paragraphs 1 through 79 of this Complaint as if restated herein.

107.   O.C.G.A. § 16-9-93.1(a) provides, "[i]t shall be unlawful for any person, any organization, or any representative of any organization knowingly to transmit any data through a computer network … for the purpose of … exchanging data with an electronic mailbox … if such data uses any individual name, trade name, registered trademark, logo, legal or official seal, or copyrighted symbol to falsely identify the person, organization, or representative transmitting such data or which

would falsely state or imply that such person, organization, or representative has permission or is legally authorized to use such trade name, registered trademark, logo, legal or official seal, or copyrighted symbol for such purpose when such permission or authorization has not been obtained…"

108.   O.C.G.A. § 16-9-93.1(c) permits civil actions "for equitable or monetary relief, or both, for actions which violate this Code section."

109.   Green knowingly transmitted data and the Fraudulent Misrepresentations through a computer network to Ascentium's electronic mailbox.

110.   Green knowingly made the Fraudulent Misrepresentations to induce Ascentium to finance his purchases from IT Gurus so that he could take possession of and abscond with the Collateral.

111.   Under O.C.G.A. § 16-9-93.1, Ascentium claims and is entitled to recover damages from Green in an amount to be proven at trial.

## COUNT V

## CIVIL CONSPIRACY

### (As to all Defendants)

112.   Ascentium incorporates the allegations in paragraphs 1 through 105 of this complaint as if fully set forth herein.

113.   Defendants acted in concert to undertake the tortious conduct and other wrongs alleged herein, including specifically Green's use of the Fraudulent

Misrepresentations to defraud Ascentium with the knowledge and/or active participation of Defendants Brown and Ray.

114.   Defendants' civil conspiracy is continuous and ongoing.

115.   Under the conspiracy, all tortious conduct and other wrongs by any one conspirator shall be chargeable to all Defendants for damages, in an amount to be proven at trial, together with pre-judgment interest at the legal rate.

<u>**COUNT VI**</u>

**CIVIL LIABILITY UNDER THE GEORGIA RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT (O.C.G.A. §§ 16-14-1 ET SEQ.) AND THE FEDERAL RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT (18 U.S.C. §§ 1961–1968)**

**(As to all Defendants)**

116.   Ascentium restates and incorporates the allegations in paragraphs 1 through 105 of this complaint as if fully set forth herein.

117.   The relationship between Green, Brown, Ray, and Does constitutes an "enterprise" within the meaning of O.C.G.A. § 16-14-3(d) and 18 U.S.C. § 1961(4) (hereinafter, the "RICO Enterprise").

118.   At all relevant times, Green, Brown, Ray, and Does are and were co-conspirators and participants in the RICO Enterprise.

119.   Green, Brown, Ray, and Does operated the RICO Enterprise by the actions set forth herein.

120.   The purpose of the RICO Enterprise is and was to orchestrate a fraudulent lending scheme and to deceive Ascentium into financing business equipment under the guise that CMG was a legitimate business entity associated with CARROLL.

121.   The RICO Enterprise is and was engaged in interstate commerce and in activities affecting interstate commerce.   The RICO Enterprise is operated through individuals residing in Georgia, South Carolina, and North Carolina.

122.   In operating the RICO Enterprise, Green, Brown, Ray, and Does engaged in various forms of incidences of "racketeering activity" within the meaning of O.C.G.A. § 16-14-3(5)(A) and 18 U.S.C. § 1961(1).

123.   As to Ascentium, the RICO Enterprise involved several acts of racketeering activity constituting a "pattern of racketeering activity" within the meaning of O.C.G.A. § 16-14-3(4) and 18 U.S.C. § 1961(5).

124.   Defendants predicate acts comprising racketeering activity in the RICO Enterprise include, but are not limited to, the Mail Fraud, Wire Fraud, and Theft by Deception enumerated below.

**A.     Mail Fraud.**

125.   Mail Fraud constitutes a predicate act under O.C.G.A. § 16-14-3(5)(xliii)(C) ("racketeering activity" shall also mean any conduct defined as racketeering activity" under 18 U.S.C. § 1961(1)).

126.   Mail Fraud also constitutes a predicate act under 18 U.S.C. § 1961(1)

(any violation of 18 USC § 1341).

127.   18 U.S.C. § 1341 describes the offense of mail fraud as follows:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or deposits or causes to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail or such carrier according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined under this title or imprisoned not more than 20 years, or both.

128.   Starting no later than May 2019, Defendants engaged in an enterprise

designed to defraud and obtain money from Ascentium through mail fraud.

Specifically, Defendants knowingly held themselves out as authentic executives and

employees of CMG intending to deceive Ascentium and Industrious into believing

that CMG's business operations were legitimate.  Defendants falsely represented

that: (a) Invoice #11121 and Invoice #11127 were invoices for the purchase of

computers and computer software for a legitimate business operation; (b) Defendants were authorized employees and/or executives of CMG, a business associated with CARROLL; (c) Peter Carroll, Michael Carroll, and Matthew Clower were true identities; (d) CMG operated a legitimate business from CARROLL'S business address of 3340 Peachtree Road NE, Atlanta, GA 30326; (e) CMG operated a legitimate business from within Monarch Tower Office Space; (f) the Collateral would be located at CMG's business locations; and (g) the CMG Financial Statements and CMG Bank Statement were true and accurate.  Green arranged for the Collateral delivered by interstate carrier.

129.   Defendants knowingly participated and profited from the scheme to defraud Ascentium and wrongfully take possession of the Collateral without payment by acts of mail fraud.

130.   Defendants engaged in at least two (2) fraudulent sale transactions with Ascentium, each of which constitutes a separate predicate act, meaning that Defendants have engaged directly or indirectly in at least two (2) predicate acts towards Ascentium.

**B.    Wire Fraud.**

131.   Wire Fraud constitutes a predicate act under O.C.G.A. § 16-14-3(5)(xliii)(C) ("racketeering activity" shall also mean any conduct defined as racketeering activity" under 18 U.S.C. § 1961(1)).

132.   The definition of "racketeering activity" in 18 U.S.C. § 1961(1) includes wire fraud (any violation of 18 U.S.C. § 1343 (relating to wire fraud)).

133.   18 U.S.C. § 1343 describes the offense of wire fraud as follows:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both.

134.   Starting no later than May 2019, Defendants engaged in an enterprise designed to defraud and obtain money from Ascentium through wire fraud. Specifically, Defendants knowingly held themselves out as authentic executives and employees of CMG intending to deceive Ascentium and Industrious into believing that CMG's business operations were legitimate.  Defendants falsely represented that: (a) Invoice #11121 and Invoice #11127 were invoices for the purchase of computers and computer software for a legitimate business operation; (b) Defendants were authorized employees and/or executives of CMG, a business associated with CARROLL; (c) Peter Carroll, Michael Carroll, and Matthew Clower were true identities; (d) CMG operated a legitimate business from CARROLL'S business address of 3340 Peachtree Road NE, Atlanta, GA 30326; (e) CMG operated a legitimate business from within Monarch Tower Office Space; (f) the Collateral

would be located at CMG's business locations; and (g) the CMG Financial Statements and CMG Bank Statement were true and accurate, each of which was communicated through internet wire. Invoice #11121, Invoice #11127, the CMG Financial Statements, and CMG Bank Statement were also submitted through interstate email transmission.

135.   Defendants knowingly participated and profited from the scheme to defraud Ascentium and wrongfully take possession of the Collateral without payment by acts of wire fraud.

136.   Defendants engaged in at least two (2) fraudulent sale transactions with Ascentium, each of which constitutes a separate predicate act, meaning that Defendants have engaged directly or indirectly in at least two (2) predicate acts towards Ascentium.

## C.   Theft By Deception.

137.   Theft by deception constitutes a predicate act under O.C.G.A. § 16-14-3(5)(xii).

138.   O.C.G.A. § 16-8-3 describes the offense of theft by taking as follows:

(a)   A person commits the offense of theft by deception when he obtains property by any deceitful means or artful practice with the intention of depriving the owner of the property.

(b)   A person deceives if he intentionally:

1)      Creates or confirms another's impression of an existing fact or past event which is false and which the accused knows or believes to be false;

2)      Fails to correct a false impression of an existing fact or past event which he has previously created or confirmed;

3)      Prevents another from acquiring information pertinent to the disposition of the property involved;

4)      Sells or otherwise transfers or encumbers property intentionally failing to disclose a substantial and valid known lien, adverse claim, or other legal impediment to the enjoyment of the property, whether such impediment is or is not a matter of official record; or

5)      Promises performance of services which he does not intend to perform or knows will not be performed. Evidence of failure to perform standing alone shall not be sufficient to authorize a conviction under this subsection …

139.   Defendants committed acts of theft by deception directly or by participation in conspiracy.  The specific acts that constitute theft by deception include, but are not limited to, falsely representing that: (a) Invoice #11121 and Invoice #11127 were invoices for the purchase of computers and computer software for a legitimate business operation; ((b) Defendants were authorized employees and/or executives of CMG, a business associated with CARROLL; (c) Peter Carroll, Michael Carroll, and Matthew Clower were true identities; (d) CMG operated a legitimate business from CARROLL'S business address of 3340 Peachtree Road

NE, Atlanta, GA 30326; (e) CMG operated a legitimate business from within Monarch Tower Office Space; (f) the Collateral would be located at CMG's business locations; and (g) the CMG Financial Statements and CMG Bank Statement were true and accurate.

140.   Defendants multiple illegal acts have been taken as part of an ongoing pattern of racketeering activity designed to obtain money from Ascentium.

141.   As a direct and proximate result of this racketeering activity, Ascentium had and continues to be injured and suffer actual damages in an amount to be demonstrated at trial.

142.   Pursuant to O.C.G.A. § 16-8-6(c) and 18 U.S.C. § 1964(c), Ascentium is entitled to recover three times actual damages sustained from Defendants, plus punitive damages, attorney fees, and costs of investigation and litigation.

## COUNT VII

### BREACH OF CONTRACT

### (As to Defendant Marshall Lebarron Green)

143.   Ascentium incorporates the allegations in paragraphs 1 through 68 of this Complaint as if restated herein.

144.   Pursuant to the provisions of the First EFA, Ascentium loaned funds to Green a/k/a Matthew Clower, a/k/a Peter Carroll, a/k/a Michael P. Carroll, d/b/a CMG for the purchase of the First Computers.  In return, Green agreed to repay

advances from Ascentium in strict accordance with the payment schedule set forth therein.

145.   Pursuant to the provisions of the First EFA, Green agreed to make 60 consecutive monthly payments of $3,135.91 by the 20th day of each month, beginning in the month of June 2019.

146.   Green defaulted under the First EFA by virtue of his failure to timely make the full monthly installment payment due by June 20, 2019.

147.   Green having remained in default, Ascentium has exercised its right to accelerate the remaining balance of the First EFA.

148.   The outstanding balance of EFA 2374557 as of February 7, 2020 is **$180,365.83**, inclusive of default interest accruing at 1.5% per month or 18.00% per annum, itemized as follows:

| | |
|---|---|
| $25,087.28 | Past-Due Payments |
| $313.59 | Late Charges |
| $152.50 | Site Inspection Charges |
| $195.00 | Loan Processing Charges |
| $1,665.05 | Default Interest (1.5% per month) |
| $152,952.41 | Future Payments (3% present value discount applied) |
| **$180,365.83** | |

149.   Additional interest has continued to accrue on the principal balance of the First EFA after February 7, 2020 at the rate of 18.00% per annum in accordance with the terms thereof.

150.   Green is liable to Ascentium for the outstanding balance of the First EFA as of February 7, 2020, in addition to any and all interest and other sums accruing after such date.

## COUNT VIII

## BREACH OF CONTRACT

## (As to Defendant Marshall Lebarron Green)

151.   Ascentium incorporates the allegations in paragraphs 1 through 68 of this Complaint as if restated herein.

152.   Pursuant to the provisions of the Second EFA, Ascentium loaned funds to Green a/k/a Matthew Clower, a/k/a Peter Carroll, a/k/a Michael P. Carroll, d/b/a CMG for the purchase of the Second Computers.  In return, Green agreed to repay advances from Ascentium in strict accordance with the payment schedule set forth therein.

153.   Pursuant to the provisions of the Second EFA, Green agreed to make 36 consecutive monthly payments of $5,307.10 by the 1st day of each month, beginning in the month of July 2019.

154.   Green defaulted under the Second EFA by virtue of his failure to timely make the full monthly installment payment due by July 1, 2019.

155.   Green having remained in default, Ascentium has exercised its right to accelerate the remaining balance of the Second EFA.

156.   The outstanding balance of the Second EFA as of February 7, 2020 is **$184,549.91**, inclusive of default interest accruing at 1.5% per month or 18.00% per annum, itemized as follows:

| | |
|---|---|
| $42,456.80 | Past-Due Payments |
| $152.50 | Site Inspection Charges |
| $60.00 | Return Item Charges |
| $195.00 | Loan Processing Charges |
| $2,476.61 | Default Interest (1.5% per month) |
| $139,209.00 | Future Payments (3% present value discount applied) |
| **$184,549.91** | |

157.   Additional interest has continued to accrue on the principal balance of the Second EFA after February 7, 2020 at the rate of 18.00% per annum in accordance with the terms thereof.

158.   Green is liable to Ascentium for the outstanding balance of the Second EFA as of February 7, 2020, in addition to any and all interest and other sums accruing after such date.

## COUNT IX

### UNJUST ENRICHMENT

### (As to all Defendants)

159.   Ascentium restates and incorporates the allegations in paragraphs 1 through 68 of this complaint as if fully set forth herein.

160.   Ascentium funded $313,465.30 pursuant to the Equipment Finance Agreements, with each loan funding the purchase of the Collateral.

161.   On information and belief, Green took possession of the Collateral.

162.   Defendants knew of or appreciated the benefit of the funding in the amount of $313,465.30.

163.   As such, Defendants are liable to Ascentium for unjust enrichment in an amount to be demonstrated at trial.

## COUNT X

### WRIT OF POSSESSION

### (As to all Defendants)

164.   Ascentium restates and incorporates the allegations in paragraphs 1 through 68 of this complaint as if fully set forth herein.

165.   Defendants have been in breach of the EFAs by virtue of their failure to make any payments due under the EFAs.

166.   Defendants have not cured the breach.

167.   Ascentium elects to assert its right in the Collateral and is entitled to take possession of the Collateral under the EFAs, O.C.G.A. §§ 44-14-230 et. seq., and applicable law.

168.   Despite demand, Defendants have failed and refused to tender possession of the Collateral to Ascentium as of the date hereof.

169.   As such, Ascentium requests the issuance of a Writ of Possession in Ascentium's favor with respect to the Collateral.

## **COUNT XI**

## **ATTORNEYS' FEES**

### **(As to all Defendants)**

170.   Ascentium restates and incorporates the allegations in paragraphs 1 through 68 of this complaint as if fully set forth herein.

171.   Defendants' actions, as described above, have been in bad faith, have been stubbornly litigious and have caused Ascentium unnecessary trouble and expense so as to justify an award of its attorneys' fees and costs of litigation, pursuant to O.C.G.A. § 13-6-11.

## **COUNT XII**

## **PUNITIVE DAMAGES**

### **(As to all Defendants)**

172.   Ascentium restates and incorporates the allegations in paragraphs 1 through 68 of this complaint as if fully set forth herein.

173.   Defendants' actions demonstrate that intentional or willful misconduct and an entire want of care or indifference to consequences, so as to justify an award of punitive damages.

**WHEREFORE**, having stated its complaint against these Defendants, Ascentium requests the following relief in this action:

A.     Under Count I, for judgment against Defendant Green, for compensatory damages in an amount to be proven at trial;

B.     Under Count II, for judgment against Defendant Brown for compensatory damages in an amount to be proven at trial;

C.     Under Count III, for judgment against Defendant Ray for compensatory damages in an amount to be proven at trial;

D.     Under Count IV, for judgment against Defendant Green, for compensatory damages in an amount to be proven at trial;

E.     Under Count V, for judgment against all Defendants, joint and several, for compensatory damages in an amount to be proven at trial;

F.     Under Count VI, for judgment against all Defendants, joint and several, for a sum equal to three times the actual damages proven at trial, plus reasonable attorney fees and costs;

G.     Under Count VII, for judgment against Green, for the outstanding balance of $180,365.83 under EFA 2374557 as of February 7, 2020, together with additional prejudgment interest accruing after February 7, 2020 at the contractual rate of 1.5% per month and post-judgment interest on the principal sum awarded at the contractual rate of 1.5% per month;

H.     Under Count VIII, for judgment against Green, for the outstanding balance of $184,549.91 under EFA 2376391 as of February 7, 2020, together with

additional prejudgment interest accruing on EFA 2376391 after February 7, 2020 at the contractual rate of 1.5% per month and post-judgment interest on the principal sum awarded at the contractual rate of 1.5% per month;

I.     Under Count IX, for judgment against all Defendants, joint and several, for compensatory damages in an amount to be proven at trial;

J.     Under Count X, for the issuance of a Writ of Possession in Ascentium's favor with respect to the Collateral;

K.     Under Count XI, for judgment against all Defendants, joint and several, for reasonable attorney's fees and expenses of litigation in amounts to be proven at trial;

L.     Under Count XII, for judgment against all Defendants, joint and several, for an assessment of punitive damages against these Defendants in an amount determined by the enlightened consciousness of the jury;

M.     Under all Counts, for nominal damages in the alternative;

N.     Under all Counts, for post-judgment interest on the principal sums awarded at the legal rate permitted under applicable law; and

O.     Under all Counts, for such other and further legal and equitable relief that the Court deems just and appropriate.

Submitted by:

BAKER, DONELSON, BEARMAN,
CALDWELL & BERKOWITZ, P.C.

*/s/ Kathleen G. Furr*
Kevin A. Stine
Georgia Bar No. 682588
Email: kstine@bakerdonelson.com
Kathleen G. Furr
Georgia Bar No. 589008
Email: kfurr@bakerdonelson.com
Monarch Plaza, Suite 1600
3414 Peachtree Road, NE
Atlanta, Georgia 30326
404.577.6000 (Telephone)
404.221.6501 (Facsimile)

*Counsel for Ascentium Capital LLC*